Dapper Dev., L.L.C. v. Cordell, 2025 NCBC 33.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV018718-590

DAPPER DEVELOPMENT, L.L.C.;
TANTALUM HOLDINGS, LLC;
BRENDAN GELSON; KYLE
TUDOR; and MASON HARRIS,

Plaintiffs,

v.

ANDREW CORDELL,

Defendant.

**ORDER AND OPINION ON
PLAINTIFFS' MOTION FOR
JUDGMENT ON THE PLEADINGS**

1.    **THIS MATTER** is before the Court upon Plaintiffs' Motion for Judgment on the Pleadings (the "Motion"), filed pursuant to Rule 12(c) of the North Carolina Rules of Civil Procedure (the "Rule(s)") on 20 November 2024 in the above-captioned case.[1]

2.    Having considered the Motion, the parties' briefs in support of and in opposition to the Motion, the relevant pleadings, the arguments of counsel at the hearing on the Motion, and other appropriate matters of record, the Court hereby **GRANTS** in part and **DENIES** in part the Motion.

> *Venn Law Group, by Megan Sadler and Gordon Wikle, for Plaintiffs Dapper Development, L.L.C., Tantalum Holdings, LLC, Brendan Gelson, Kyle Tudor, and Mason Harris.*
>
> *Wagner Hicks, PLLC, by Sean C. Wagner, for Defendant Andrew Cordell.*

Brown, Judge.

---

[1] (Pls.' Mot. J. Pleadings [hereinafter, "Mot."], ECF No. 42.)

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

3. The Court does not make findings of fact when ruling on a motion for judgment on the pleadings under Rule 12(c) and instead recites only those allegations in the pleadings that are relevant and necessary to the Court's determination of the motion.

4. Plaintiffs Brendan Gelson ("Gelson"), Kyle Tudor ("Tudor"), and Mason Harris ("Harris") (collectively, the "Individual Plaintiffs") and Defendant Andrew Cordell ("Cordell" or "Defendant") are the sole owners of Plaintiffs Dapper Development, L.L.C. ("Dapper") and Tantalum Holdings, LLC ("Tantalum"; together with Dapper, the "Companies").[2] Dapper primarily constructs new homes and renovates and resells single family homes while Tantalum acquires and rents various residential properties in Mecklenburg County as well as one property in Watauga County, North Carolina.[3]

5. The Companies are governed by substantially similar operating agreements, which Gelson, Tudor, Harris, and Cordell entered into on 10 February 2022 (the "Operating Agreements").[4] Sections 5.1 and 5.2 of the Operating Agreements provide that the Companies shall be operated by Managers and specify

---

[2] (Compl. ¶ 19, ECF No. 2; Answer ¶ 19, ECF No. 35; *see also* Compl., Exs. 1, 2; Answer & Countercls., Ex. 1, ECF No. 35.1; Answer & Countercls., Ex. 2, ECF No. 35.2.)

[3] (Compl. ¶¶ 13–14, 16; Answer ¶¶ 13–14, 16.)

[4] (Compl. ¶ 17; Countercls. ¶ 18, ECF No. 35; Compl., Exs. 1, 2; Answer & Countercls., Exs. 1, 2.)

that "[e]ach Member, by virtue of his or her status as a Member, shall be a Manager of the Compan[ies.]"[5] The Operating Agreements identify Gelson, Tudor, Harris, and Cordell as the sole Members and Managers of the Companies and, at the time the Operating Agreements were signed, each owned a 25% membership interest in each of the Companies, granting them equal voting interests in each Company.[6]

6. In early 2023, after a series of disputes arose between Cordell and the Individual Plaintiffs regarding the management of the Companies, the Individual Plaintiffs began discussing Cordell's exit from the Companies.[7] From approximately April to June of 2023, the Individual Plaintiffs and Cordell attempted to negotiate a voluntary buyout of Cordell's membership interest.[8]

7. On 14 June 2023 the Individual Plaintiffs, collectively owning a majority of the membership interests in the Companies, sent a notice to Cordell advising him that, pursuant to Section 5.2 and 10.2(b) of the Operating Agreements,[9] they had voted in favor of:

---

[5] (Compl., Exs. 1, 2; Answer & Countercls., Exs. 1, 2.)

[6] (Compl. ¶ 19; Answer ¶ 19; Compl., Exs. 1, 2; Answer & Countercls., Exs. 1, 2.)

[7] (Compl. ¶¶ 35–51; Countercls. ¶¶ 48–68.)

[8] (Compl. ¶¶ 50–67; Countercls. ¶¶ 61–76.)

[9] Section 5.2 of the Operating Agreements specifies that "[e]ach Manager shall have a voting interest which is proportional to his . . . Member's interest in [Dapper / Tantalum] as set forth on Schedule A attached hereto."

Section 10.2(b) of the Operating Agreements provides as follows:

> A Member shall be terminated from the Company upon an affirmative vote in favor of such termination from the Members constituting a majority of the membership interest of the Company. Upon a Member's termination of

(i)     the termination of the employment of Andrew Cordell ("Mr. Cordell") by [the Companies] effective immediately;

(ii)    the termination of Mr. Cordell from [the Companies] effective immediately; and

(iii)   the removal of Mr. Cordell as a manager of [the Companies] effective immediately.[10]

In addition, the Individual Plaintiffs offered Cordell a cash payment of $485,000, subject to adjustment, and quitclaim title to the 1742 Winston property (the "Winston Property") as payment for Cordell's membership and economic interest in the Companies.[11]

8.      On 15 June 2023, Cordell rejected the Individual Plaintiffs' buyout offer and extended a counteroffer, which was summarily rejected by the Individual Plaintiffs.[12] Soon thereafter, on 23 June 2023, Cordell filed the lawsuit styled, *Andrew Cordell v. Brendan Gelson, et al.*, 2023-CVS-10868 (the "Initial Lawsuit") in Mecklenburg

---

employment with [Dapper/Tantalum] (other than retirement), or upon a Member's expiration of the term of employment ("Triggering Event"), the Member shall sell and the Company or the surviving Members shall purchase all of the Membership and Economic Interest of the Member. The procedures for purchase described in Section 10.2.a shall apply. The purchase price shall be determined in accordance with Section 10.2.d below, and unless otherwise agreed among the parties the purchase price shall be due and payable in cash at closing.

(Compl., Exs. 1, 2; Answer & Countercls., Exs. 1, 2.)

[10] (Compl. ¶ 69; Countercls. ¶ 76; Compl., Ex. 4; Answer & Countercls., Ex. 7, ECF No. 35.7.)

[11] (Compl., Ex. 4; Answer & Countercls., Ex. 7.)

[12] (Answer & Countercls., Ex. 8, ECF No. 35.8; Answer & Countercls., Ex. 9, ECF No. 35.9.)

County Superior Court.  The case was designated a mandatory complex business case and assigned to Chief Judge Louis Bledsoe, III.

9.     In his amended complaint filed in the Initial Lawsuit on 14 July 2023, Cordell alleged that:

(i)     "In addition to their roles as members and managers*, [Cordell] and [Gelson, Harris, and Tudor] each serve as employees* of Dapper and Tantalum with varying responsibilities."[13]

(ii)    "While their roles as *employees* provide Plaintiff [Cordell] and Member Defendants with different responsibilities and authorities, they cannot act for Dapper or Tantalum without majority support from the other members/managers."[14]

(iii)   "Based on the language in section 10.2.b of the Operating Agreement, Plaintiff [Cordell] argued that the vote to terminate would not affect Plaintiff's status as a Member of the Companies, but only serve to *terminate his employment with the Companies*."[15]

(iv)    "Following the *termination of Plaintiff [Cordell's] employment* with the Companies and Member Defendants taking actions to prevent him from accessing the Companies' properties, Defendants continued to use Plaintiff's general contractor's license for the necessary permits for ongoing construction and renovation projects."[16]

---

[13] Plaintiffs attached the First Amended Complaint Cordell filed in the Initial Lawsuit as an exhibit to their Complaint.  (Compl., Ex. 6 [hereinafter, "Initial Lawsuit Am. Compl."] ¶ 19, ECF No. 2 (emphasis added).)  Defendant similarly attached the First Amended Complaint filed in the Initial Lawsuit as an exhibit to his Answer and Counterclaims.  (Answer & Countercls., Ex. 20 [hereinafter, "Initial Lawsuit Am. Compl."], ECF No. 35.20.)  The Court may take judicial notice of the Initial Lawsuit among the parties.  *See Stocum v. Oakley*, 185 N.C. App. 56, 61 (2007) ("Trial courts may properly take judicial notice of its [sic] own records in any prior or contemporary case when the matter noticed has relevance.") (citation and quotation marks omitted).

[14] (Initial Lawsuit Am. Compl. ¶ 20 (emphasis added).)

[15] (Initial Lawsuit Am. Compl. ¶ 35 (emphasis added).)

[16] (Initial Lawsuit Am. Compl. ¶ 50 (emphasis added).)

(v) "Plaintiff has argued and continues to maintain that based on the reference to employment, the ***termination vote only has the effect of terminating Plaintiff's status as an employee***."[17]

(vi) "For the reasons stated above, ***Plaintiff requests an Order from this Court declaring that the vote to terminate had the limited effect of terminating Plaintiff's status as an employee*** of the Company."[18]

(vii) "Pursuant to Section 10.2.b & d of the Operating Agreements, upon termination of a member's employment, the member shall sell their Membership Interests to the Companies for the fair market value."[19]

In his response brief to the motion to dismiss filed by defendants in the Initial Lawsuit, Cordell further clarified that he "does not dispute that a 'Triggering Event,' as defined in Section 10.2.b of the Operating Agreements, has occurred. . . . [T]he dispute centers around the effect of a 'Triggering Event' — not whether a 'Triggering Event' took place."[20]

10. During the pendency of the Initial Lawsuit, Cordell, Gelson, Harris, and Tudor continued negotiating the buyout of Cordell's membership interests in the Companies and, on 1 November 2023, the parties entered into an Interest and Property Transfer Agreement related to the Winston Property as a partial redemption of Cordell's membership interests.[21] Then, on 13 December 2023, this Court entered a Consent Scheduling Order (the "Consent Order") executed by the

---

[17] (Initial Lawsuit Am. Compl. ¶ 54 (emphasis added).)

[18] (Initial Lawsuit Am. Compl. ¶ 56 (emphasis added).)

[19] (Initial Lawsuit Am. Compl. ¶ 84.)

[20] (Initial Lawsuit Mem. Opp. Defs.' Mot. Dismiss 3–4, ECF No. 33.)

[21] (Compl., Ex. 9; Compl. ¶¶ 114–15.)

parties. In the Consent Order, the parties "agree[d] and acknowledge[d] that the Companies are required to redeem Cordell's 25% interest in the Companies . . . [and that] [t]he following terms shall apply to the process utilized to consummate such purchase and sale, pursuant to Article 10 of the [Operating Agreements]."[22] The parties additionally agreed to "various deadlines related [to] the process of the redemption of Cordell's interest, the timing of the valuation of the fair market value of the assets to determine the value to be paid to fully redeem Cordell from both Companies, and significant disclosure of confidential information of the Companies to Cordell to support that redemption."[23] Cordell thereafter moved the Court to enforce the Consent Order in a motion filed on 6 February 2024.[24] The Court granted Cordell's motion to enforce the Consent Order in part on 23 February 2024.[25]

11. On 10 April 2024, after the parties engaged two appraisers pursuant to the process provided for in the Consent Order and Gelson, Tudor, and Harris made several additional, but unfruitful, attempts to buy out Cordell's interest, Cordell

---

[22] (Initial Lawsuit Consent Scheduling Order, ECF No. 41.) In the Order and Opinion issued by this Court on Defendant's Motion to Dismiss Pursuant to Rule 12(b)(6), the Court held that "the Consent Order is a valid and enforceable contract between the parties under North Carolina law[.]" (Order & Op. on Def.'s Mot. Dismiss Pursuant R. 12(b)(6) ¶ 52, ECF No. 31; *see also Dapper Dev., L.L.C. v. Cordell*, 2024 NCBC LEXIS 126, at **25 (N.C. Super. Ct. Sept. 25, 2024).)

[23] (Initial Lawsuit Consent Scheduling Order; *see also* Compl. ¶ 119.)

[24] (Initial Lawsuit Mot. Enforce Consent Scheduling Order & Request Expedited Disc., ECF. No. 49.)

[25] (Initial Lawsuit Order Pl.'s Mot. Enforce Consent Scheduling Order & Request Expedited Disc., ECF No. 58.)

voluntarily dismissed the Initial Lawsuit without prejudice and without prior notice to the current Plaintiffs or the Court.[26]

12. Shortly after Cordell's voluntary dismissal of the Initial Lawsuit, on 23 April 2024, Gelson, Tudor, and Harris, individually and on behalf of Dapper and Tantalum, filed the complaint initiating this action (the "Complaint"). In the Complaint, Plaintiffs assert claims against Cordell for:

(i)     breach of contract for his alleged failure to abide by the terms of the Operating Agreements;[27]

(ii)    declaratory judgment determining "the rights, duties and liabilities as between Plaintiffs and Cordell under the Operating Agreement[s]";[28]

(iii)   breach of the implied duty of good faith and fair dealing;[29]

(iv)    breach of contract for his failure to abide by the Consent Order in the Initial Lawsuit;[30] and

(v)     abuse of process.[31]

13. On 18 June 2024, Cordell filed a Motion to Dismiss pursuant to Rule 12(b)(6).[32] After full briefing and a hearing on the motion at which all parties were

---

[26] (Initial Lawsuit Notice Vol. Dism'l, ECF No. 59; *see also* Compl. ¶ 137.)

[27] (Compl. ¶¶ 150–60.)

[28] (Compl. ¶¶ 161–69.)

[29] (Compl. ¶¶ 170–75.)

[30] (Compl. ¶¶ 176–83.)

[31] (Compl. ¶¶ 184–94.)

[32] (Def.'s Mot. Dismiss, ECF No. 12.)

represented by counsel, this Court granted Cordell's motion in part, dismissing with prejudice Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing with respect to subparagraphs (c), (d), (i), (j), (k), and (l) of paragraph 174 of the Complaint.[33] Cordell's Motion to Dismiss was otherwise denied.

14. After the Court's partial denial of Defendant's Motion to Dismiss, on 7 October 2024, Cordell filed an Answer and Counterclaims, asserting counterclaims against Plaintiffs for:

(i) declaratory judgment that "Cordell was not an employee of the Companies as of June 14, 2023";[34]

(ii) negligent or fraudulent misrepresentation of Cordell's employment status;[35]

(iii) violation of the North Carolina Wage and Hour Act;[36]

(iv) declaratory judgment that "a Triggering Event for purposes of Section 10.2(b) did not and could not occur, because Cordell was never an employee of the Companies";[37]

---

[33] (Order & Op. on Def.'s Mot. Dismiss Pursuant R. 12(b)(6); *see also Dapper Dev., L.L.C. v. Cordell*, 2024 NCBC LEXIS 126 (N.C. Super. Ct. Sept. 25, 2024).)

[34] (Countercls. ¶ 207.)

[35] (Countercls. ¶¶ 241–47.)

[36] (Countercls. ¶¶ 248–55.)

[37] (Countercls. ¶ 262.)

(v)     declaratory judgment that "the appropriate valuation date for both the assets and liabilities of the Companies [for purposes of Section 10.2(d) of the Operating Agreements] is December 12, 2023";[38]

(vi)    declaratory judgment that "Cordell remains a Member of the Companies";[39]

(vii)   declaratory judgment that "Cordell's status as a Manager of the Companies was not terminated by the June 14, 2023 vote";[40]

(viii)  declaratory judgment that "any payment to Cordell in exchange for his Membership Interest as part of a voluntary sale of his Membership Interest is not subject to a setoff";[41]

(ix)    breach of the Operating Agreements;[42]

(x)     breach of the implied duty of good faith and fair dealing;[43]

(xi)    breach of fiduciary duty;[44]

(xii)   failure to permit Cordell to inspect the Companies' books and records;[45]

(xiii)  equitable accounting;[46]

---

[38] (Countercls. ¶ 271.)

[39] (Countercls. ¶ 285.)

[40] (Countercls. ¶ 292.)

[41] (Countercls. ¶ 299.)

[42] (Countercls. ¶¶ 301–13.)

[43] (Countercls. ¶¶ 314–18.)

[44] (Countercls. ¶¶ 319–24.)

[45] (Countercls. ¶¶ 325–37.)

[46] (Countercls. ¶¶ 338–44.)

(xiv)   reimbursement/contribution;[47] and

(xv)   judicial dissolution pursuant to North Carolina General Statute (N.C.G.S.) § 57D-6-02.[48]

Plaintiffs filed a response to Defendant's counterclaims on 31 October 2024.[49]

15.   Plaintiffs filed the current Motion before this Court on 20 November 2024, and, after full briefing, the Court held a hearing on the Motion on 26 February 2025 (the "Hearing"), at which all parties were represented by counsel. The Motion is now ripe for resolution.

II.

LEGAL STANDARD

16.   Rule 12(c) provides that "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." N.C. R. Civ. P. 12(c). Rule 12(c) is intended "to dispose of baseless claims or defenses when the formal pleadings reveal their lack of merit and is appropriately employed where all the material allegations of fact are admitted in the pleadings and only questions of law remain." *DiCesare v. Charlotte-Mecklenburg Hosp. Auth.*, 376 N.C. 63, 70 (2020) (quoting *Ragsdale v. Kennedy*, 286 N.C. 130, 137 (1974)).

17.   However, "[g]ranting judgment on the pleadings 'is not favored by law[.]'" *Bauman v. Pasquotank Cnty. ABC Bd.*, 270 N.C. App. 640, 642 (2020) (quoting

---

[47] (Countercls. ¶¶ 345–54.)

[48] (Countercls. ¶¶ 355–63.)

[49] (Answer Def.'s Countercls., ECF No. 36.)

*Carpenter v. Carpenter*, 189 N.C. App. 755, 762 (2008)).  Thus, in deciding whether to grant a motion for judgment on the pleadings, "the trial court is required to view the facts and permissible inferences in the light most favorable to the nonmoving party, with all well pleaded factual allegations in the nonmoving party's pleadings being taken as true and all contravening assertions in the movant's pleadings being taken as false."  *Anderson Creek Partners, L.P. v. Cnty. of Harnett*, 382 N.C. 1, 12 (2022) (internal quotations omitted).

18.    Under Rule 12(c), the trial court may consider "[a]n exhibit, attached to and made a part of the [complaint]," *Wilson v. Crab Orchard Dev. Co.*, 276 N.C. 198, 206 (1970), and documents that are "the subject of the action and specifically referenced in the complaint," *Erie Ins. Exch. v. Builders Mut. Ins. Co.*, 227 N.C. App. 238, 242 (2013).  Where a document is attached to a pleading, "[t]he terms of such exhibit control other allegations of the pleading attempting to paraphrase or construe the exhibit, insofar as these are inconsistent with its terms."  *Wilson*, 276 N.C. at 206.

19.    "The party moving for judgment on the pleadings must show that no material issue of fact exists and that he is entitled to judgment as a matter of law."  *Daniels v. Montgomery Mut. Ins. Co.*, 320 N.C. 669, 682 (1987).  Moreover, a "motion under Rule 12(c) must be carefully scrutinized lest the nonmoving party be precluded from a full and fair hearing on the merits."  *Newman v. Stepp*, 376 N.C. 300, 305 (2020) (citation and internal quotation marks omitted).

ANALYSIS

20.     Plaintiffs request that the Court grant their Motion for Judgment on the Pleadings as follows:

(i)     Entry of judgment on the pleadings in Plaintiffs' favor on Plaintiffs' first and fourth claims for breach of contract and second claim for declaratory judgment;

(ii)    Dismissal of Cordell's second, third, fifth, sixth, seventh, eighth, and eleventh counterclaims with prejudice;

(iii)   Dismissal of Cordell's first, fourth, twelfth, thirteenth, and fifteenth counterclaims as moot; and

(iv)    Dismissal of Cordell's ninth, tenth, and fourteenth counterclaims without prejudice.[50]

The Court will address each of the relevant claims and counterclaims, beginning with Cordell's counterclaim for declaratory judgment on Cordell's employment status.

A.  **Cordell's First Counterclaim for Declaratory Judgment – Employment Status**

21.     In his first counterclaim, Cordell takes a diametrically opposed position to that which he took in the Initial Lawsuit, alleging "[t]here exists an actual, definite, and concrete controversy between Cordell and Individual Plaintiffs related [to] whether Cordell was an employee of the Companies as of June 14, 2023."[51] Although

---

[50] (Mot. 3–4.)

[51] (Countercls. ¶ 204.)

Cordell asserted unqualifiedly in the Initial Lawsuit that he was an employee of the Companies,[52] he now requests "an Order from this Court declaring that [he] was *not* an employee of the Companies as of June 14, 2023."[53]

22. Under the Declaratory Judgment Act, "[a]ny person interested under a . . . written contract . . . , or whose rights, status or other legal relations are affected by a . . . contract . . . , may have determined any question of construction or validity arising under the . . . contract . . . , and obtain a declaration of rights, status, or other legal relations thereunder." North Carolina General Statutes ("N.C.G.S.") § 1-254. When asserting a claim for declaratory judgment, the claimant "must set forth in his pleading all facts necessary to disclose the existence of an actual controversy between the parties . . . with regard to their respective rights and duties." *Lide v. Mears*, 231 N.C. 111, 118 (1949). A motion to dismiss a declaratory judgment claim is appropriate only "when the complaint does not allege an actual, genuine existing controversy." *Legalzoom.com, Inc. v. N.C. State Bar*, 2012 NCBC LEXIS 49, at **9 (N.C. Super. Ct. Aug. 27, 2012) (quoting *N.C. Consumers Power, Inc. v. Duke Power Co.*, 285 N.C. 434, 439 (1974)).

23. Plaintiffs contend that Cordell should be judicially estopped from asserting that he was not an employee of the Companies as of 14 June 2023.[54] In his amended

---

[52] (*See supra* ¶ 9.)

[53] (Countercls. ¶ 207 (emphasis added).)

[54] (S*ee generally* Mem. L. Supp. Pls.' Mot. J. Pleadings [hereinafter, "Pls.' Br. Supp."] 9–13, ECF. No. 43.)

complaint filed in the Initial Lawsuit, Cordell repeatedly alleges that he was an employee of the Companies and that the 14 June 2023 termination vote had the effect of terminating his status as an employee of the Companies.[55] Cordell maintained this position throughout the Initial Lawsuit, and it was not until his motion to dismiss and supporting brief filed on 18 June 2024 in the current lawsuit that Cordell changed courses and alleged he was never an employee of the Companies.[56] Cordell, however, contends "application of judicial estoppel is inappropriate and would lead to an inequitable and unjust outcome."[57]

24. Our Supreme Court first recognized the doctrine of judicial estoppel in *Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1 (2004), and noted that "the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle." *Id.* at 28. The purpose of the doctrine, the Court noted, is "to protect the integrity of judicial proceedings" from "individuals who would play 'fast and loose' with the judicial system." *Id.* at 26. The doctrine "prohibit[s] parties from deliberately changing positions according to the exigencies of the moment[.]" *Id.* at 28. "[J]udicial estoppel forbids a party from asserting a legal position inconsistent with one taken earlier in the same or related litigation." *Price v. Price*, 169 N.C. App. 187, 191 (2005). North

---

[55] (*See, e.g.*, Initial Lawsuit Am. Compl. ¶¶ 19, 20, 35, 50, 54, 56, 70, 97, 103; *see also supra* ¶ 9.)

[56] (Def.'s Mot. Dismiss 2; Mem. L. Supp. Mot. Dismiss Pls.' Compl. 2, 10, 14, ECF No. 13; *see also* Pls.' Br. Supp. 7.)

[57] (Def. Andrew Cordell's Br. Opp. Pls.' Mot. J. Pleadings [hereinafter, "Def.'s Resp."] 9, ECF No. 57.)

Carolina courts have further held that it is appropriate for a trial court to consider whether the doctrine of judicial estoppel is applicable upon a Rule 12(c) motion and to consider pleadings in a related prior action for the purposes of judicial estoppel so long as they are attached to or the subject of the complaint. *Estate of Means v. Scott Elec. Co.*, 207 N.C. App. 713, 716–17 (2010). A party's voluntary dismissal of a prior action pursuant to Rule 41(a) does not bar the application of judicial estoppel in a subsequent lawsuit. *Se. Shortlines, Inc. v. Rutherford R.R. Dev. Corp.*, 2012 N.C. App. LEXIS 743, at *5, 12–13 (2012).

25. In *Whitacre P'ship*, our Supreme Court stated that "judicial estoppel is to be applied in the sound discretion of [the] trial courts" and listed three factors that may be considered by the trial court in determining whether judicial estoppel should be applied:

> First, a party's subsequent position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding might pose a threat to judicial integrity by leading to inconsistent court determinations or the perception that either the first or the second court was misled. Third, courts consider whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Whitacre P'ship*, 358 N.C. at 29, 33 (cleaned up). However, the first factor is the only factor that must be present for judicial estoppel to apply. *Wiley v. United Parcel Serv., Inc.*, 164 N.C. App. 183, 188 (2004).

26. Preliminarily, Cordell contends that judicial estoppel should not apply to his assertions regarding employment because the meaning of "employment" is a legal

position.[58] Judicial estoppel, Cordell states, is "limited to the context of inconsistent *factual assertions* and . . . should not be applied to prevent the assertion of inconsistent legal theories." *Whitacre P'ship*, 358 N.C. at 32.

27. The Court disagrees. While the question of whether someone is an "employee" is often a mixed question of law and fact, here, for the duration of the Initial Lawsuit, Cordell made repeated and unqualified factual allegations in his pleadings that he was an employee of the Companies. *See, e.g., Askew v. Leonard Tire Co.*, 264 N.C. 168 (1965). In the Background section of his amended complaint filed in the Initial Lawsuit, Cordell asserted that he was an employee of the Companies four times.[59] Furthermore, not once during the pendency of the Initial Lawsuit did Cordell ever contest the plain and unambiguous language of the Operating Agreements that he was an employee of the Companies. *See, e.g., State ex rel. Emp. Sec. Com. v. Faulk*, 88 N.C. App. 369, 374 (1988) (typical questions of law regarding employee status involve matters such as a company's requisite degree of control over a person to legally classify them as an "employee"). Thus, this Court holds that the doctrine of judicial estoppel can be applied to Cordell's repeated factual allegations in a prior civil action before this Court that he was an employee of the Companies.

28. As only the first factor must be present for judicial estoppel to apply, the dispositive issue is whether Cordell's position on his employment status, based upon

---

[58] (Def.'s Resp. 10.)

[59] (Initial Lawsuit Am. Compl. ¶¶ 19, 20, 35, 50.)

the factual allegations in the instant case, is clearly inconsistent with his position as asserted in his earlier action. *Wiley*, 164 N.C. App. at 188. Here, in the amended complaint filed in the Initial Lawsuit, Cordell unqualifiedly alleged multiple times that he was an employee of the Companies.[60] Then, after months of litigation and without prior notice to the parties or the Court, Cordell unilaterally filed a Rule 41(a) voluntary dismissal of the Initial Lawsuit. Now, in a new lawsuit also pending in the Business Court, Cordell unqualifiedly alleges the diametrically opposite position that he never was an employee of the Companies.[61] Cordell's current position is "clearly inconsistent" with the position Cordell asserted in the Initial Lawsuit.

29. The second and third *Whitacre* factors are also present in this instance. In the Consent Order executed by the parties and approved by this Court in the Initial Lawsuit, the Court ordered that the parties redeem Cordell's 25% interest in the Companies pursuant to the process set forth in Section 10.2(d) of the Operating Agreements.[62] In entering the Consent Order, the Court necessarily accepted Cordell's initial assertions that he was an employee of the Companies and that his employment with the Companies had been terminated. For the redemption process set forth in Section 10.2(d) of the Operating Agreements to be triggered, Cordell must have been an employee and his employment with the Companies must have been

---

[60] (*See supra* ¶ 9 and related footnotes.)

[61] (*See generally,* Countercls.)

[62] (Initial Lawsuit Consent Scheduling Order 2–6.)

terminated.[63]  This Court again accepted Cordell's earlier position that he was an employee and that his employment had been terminated, constituting a "Triggering Event" under the Operating Agreements, in its 2 February 2024 and 23 February 2024 Orders wherein the Court ordered that the appraisal process set forth in the Consent Order proceed.[64]  Acceptance of Cordell's current position that he was not an employee of the Companies and, therefore, that his employment could not have been terminated and a Triggering Event initiating the 10.2(d) appraisal process could not have occurred, would doubtlessly result in inconsistent court determinations and create the very real perception that this Court was misled.

30.  Lastly, Cordell would impose an unfair detriment on Plaintiffs if not judicially estopped.  The Individual Plaintiffs spent nearly two years defending the Initial Lawsuit, engaging in the 10.2(d) appraisal process, participating in buyout negotiations, and prosecuting the current action based on Cordell's repeated initial assertions that he was an employee of the Companies.  The Individual Plaintiffs, pursuant to the terms of the Consent Order, additionally provided sensitive company information to Cordell on the belief that it would facilitate the appraisal and redemption process.

---

[63] Section 10.2 of the Operating Agreements provides the redemption process set forth in Section 10.2(d) can additionally be triggered by the death of a member or the expiration of a member's term of employment, neither of which are applicable here.  (Compl., Exs. 1, 2; Answer & Countercls., Exs. 1, 2.)

[64] (Initial Lawsuit Order Pl.'s Mot. Enforce Consent Scheduling Order & Request Expedited Disc. 7; Initial Lawsuit Order on Appraisal Process, ECF No. 48.)

31.     For the reasons stated above, the Court concludes, in its discretion, that the doctrine of judicial estoppel bars Cordell from alleging he is not, and never was, an employee of the Companies.  Thus, the Court **GRANTS** Plaintiffs' Motion for judgment on the pleadings on Defendant's first counterclaim for declaratory judgment and dismisses this counterclaim with prejudice.

**B. <u>Cordell's Second Counterclaim for Negligent or Fraudulent Misrepresentation</u>**

32.     Cordell attempts to avoid application of judicial estoppel against his assertions in the Initial Litigation that he was an employee of the Companies by alleging in this action that the Individual Plaintiffs fraudulently or negligently "misrepresented Cordell's employment status on, at least, the following occasions" to "mislead him into believing that the buyout provisions of Section 10.2(b) of the Operating Agreements were triggered":[65]

(i)     8 June 2023 representation by the Individual Plaintiffs' first attorney that, "unless Cordell agreed to resign from the Companies as an employee, Member, and Manager, [the Individual Plaintiffs] would vote to 'terminate' Cordell as an employee, Member, and Manager";[66]

(ii)    14 June 2023 Termination Notice, "whereby Individual Plaintiffs represented to Cordell that his employment with the Companies had been terminated and he was no longer an employee of the Companies";[67]

---

[65] (Countercls. ¶¶ 243, 245.)

[66] (Countercls. ¶ 70.)

[67] (Countercls. ¶ 243.)

(iii) 11 July 2023 correspondence from Individual Plaintiffs, "whereby it was reiterated that they had voted to terminate Cordell's employment with the Companies";[68] and

(iv) 4 August 2023 correspondence "whereby Plaintiffs' counsel stated that it was undisputed that Cordell's employment was terminated."[69]

Cordell further claims Plaintiffs knew that Cordell was not an employee of the Companies when making these misrepresentations and that he relied on Plaintiffs' representations by taking steps to engage in the Section 10.2 buyout process.[70]

33. For a fraud claim to withstand a motion for judgment on the pleadings, a counterclaim plaintiff must allege that the counterclaim defendants (1) made a false misrepresentation, (2) reasonably calculated to deceive, (3) with the intent to deceive, (4) which did in fact deceive, and (5) resulted in damage to the plaintiff. *Value Health Sols., Inc. v. Pharm. Rsch. Assocs.*, 385 N.C. 250, 264 (2023). Additionally, Rule 9(b) of our Rules of Civil Procedure requires that the circumstances, of which the plaintiff contends constitute fraud, be stated with particularity. As to claims for fraudulent misrepresentation, the plaintiff must allege the "time, place and content of the fraudulent representation, identity of the person making the representation and what was obtained as a result of the fraudulent acts or representations." *Terry v. Terry*, 302 N.C. 77, 85 (1981). "Furthermore, any reliance on alleged false

---

[68] (Countercls. ¶ 243.)

[69] (Countercls. ¶ 243.)

[70] (Countercls. ¶¶ 72, 75, 78, 244, 246.)

representations must be reasonable. Reliance is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence but failed to investigate." *Cobb v. Pa. Life Ins. Co.*, 215 N.C. App. 268, 277 (2011) (citing *State Props. v. Ray*, 155 N.C. App. 65, 72 (2002)). *See also Kumar v. Patel*, 2024 NCBC LEXIS 36, at **29 (N.C. Super. Ct. Feb. 28, 2024) ("Reliance is not reasonable if Plaintiffs fail to make any independent investigation as to the truth of the assertion.") (citing *Calloway v. Wyatt*, 246 N.C. 129, 130 (1957)).

34. Negligent misrepresentation "occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *BDM Invs. v. Lenhil, Inc.*, 264 N.C. App. 282, 299 (2019) (citing *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 206 (1988) and *Rountree v. Chowan Cnty.*, 252 N.C. App. 155, 162 (2017)). As with fraudulent misrepresentation, for purposes of negligent misrepresentation, reliance is not reasonable or justifiable "if a plaintiff failed to make reasonable inquiry, had the opportunity to investigate, and could have learned the true facts through reasonable diligence." *Id.* (cleaned up). "The extent to which a party justifiably relied upon items of information is generally a question for the jury in the absence of a showing that 'the facts are so clear as to permit only one conclusion.'" *Cummings v. Carroll*, 379 N.C. 347, 366 (2021) (quoting *Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP*, 350 N.C. 214, 225 (1999)).

35. Even when viewing the facts and permissible inferences in the light most favorable to Cordell and taking all well pleaded factual allegations in Cordell's

counterclaims as true, "the facts are so clear as to permit only one conclusion" that Cordell's reliance on Plaintiffs' representations of his employment status was not reasonable or justifiable. In his counterclaims, Cordell alleges he relied on the Individual Plaintiffs' representations of his employment status in communications made between June and August 2023.[71] However, Cordell was a founding member of Dapper and Tantalum, had been with the Companies since their respective formation in February 2020 and January 2021, participated in the drafting and updating of the Operating Agreements, and had access to the Companies' books and records prior to June 2023.[72] Furthermore, Cordell initiated and prosecuted a lawsuit for approximately nine months in which he unqualifiedly alleged repeatedly that he was an employee of the Companies, allegations on which the Court and the other parties relied in agreeing to a Consent Order enabling the parties to pursue a buyout of Cordell's interest in the Companies pursuant to the Operating Agreements.[73] Based on the allegations contained in Cordell's counterclaims, there are no *facts* showing that at any point between Cordell's "termination" from the Companies in June 2023 and the dismissal of the Initial Lawsuit and initiation of this action in April 2024 Cordell took steps to investigate the veracity of Individual Plaintiffs' alleged statements relating to his status as an employee of the Companies.[74]

---

[71] (Countercls. ¶ 243.)

[72] (Countercls. ¶¶ 16–18.)

[73] (*See, e.g.*, Initial Lawsuit Am. Compl. ¶¶ 19, 20, 35, 50, 54, 56.)

[74] (*See, e.g.,* Countercls. ¶¶ 185–92). Cordell attempts to bolster his claims for fraudulent and negligent misrepresentation by conclusorily stating, "[w]hile Cordell undertook efforts to

36. As Cordell fails to allege facts constituting reasonable reliance, the Court **GRANTS** Plaintiffs' Motion to the extent it pertains to Defendant's second counterclaim for negligent or fraudulent misrepresentation and dismisses this counterclaim with prejudice. *See, e.g. Martin Commc'ns, LLC v. Flowers*, 2021 NCBC LEXIS 30, at \*\*16–17 (N.C. Super. Ct. Mar. 31, 2021) (dismissing Plaintiff's claims for fraud and negligent misrepresentation because the Amended Complaint is "devoid of any allegations that Plaintiff even attempted to investigate the veracity of Defendants' statements" and finding allegations that "these representations involved information which was exclusively within the knowledge of the Defendants, and [Plaintiff] had no way to ascertain the falsity of these representations at the time

---

investigate Plaintiffs' representations, he was limited to the information that was available to him, which did not include the Companies' up to date records, which left him unable to learn the true facts." (Def.'s Resp. 24–25.) However, Cordell fails to state with particularity the investigatory efforts he allegedly took, as required by Rule 9. He fails to identify with specificity the limited information available to, or records unavailable to, him or what information Plaintiffs possess that he does not have equal access to, regarding his status as an employee. The North Carolina Supreme Court has described the following factors for determining whether an employer-employee relationship exists:

> [t]he person employed
>
> (a) is engaged in an independent business, calling, or occupation;
> (b) is to have the independent use of his special skill, knowledge, or training in the execution of the work;
> (c) is doing a specified piece of work at a fixed price or for a lump sum or upon a quantitative basis;
> (d) is not subject to discharge because he adopts one method of doing the work rather than another;
> (e) is not in the regular employ of the other contracting party;
> (f) is free to use such assistants as he may think proper;
> (g) has full control over such assistants; and
> (h) selects his own time.

*Bordini v. Donald J. Trump for President, Inc.*, 2019 N.C. App. LEXIS 2, 5 (2019) (citing *Hayes v. Bd. of Trs. of Elon Coll.*, 224 N.C. 11, 16 (1944)). None of the above-listed factors require Cordell to have access to the Companies' records.

they were made" conclusory and insufficient to support Plaintiff's claims for fraud and negligent misrepresentation); *Burton v. Hobart Fin. Grp., Inc.*, 2024 NCBC LEXIS 34, at **61–62 (N.C. Super. Ct. Feb. 26, 2024) (finding Rule 9(b)'s specificity requirements were not met and dismissing Plaintiffs' fraudulent misrepresentation claim because there was no allegation that Plaintiffs exercised reasonable diligence to independently investigate the truth of the assertion).

## C. Cordell's Third Counterclaim for Violation of North Carolina's Wage & Hour Act

37. In his third counterclaim, Cordell pleads in the alternative that, if he is determined to be an employee of the Companies, Plaintiffs violated the North Carolina Wage and Hour Act by "fail[ing] to pay Cordell the statutory minimum wage or overtime pay during the course of his employment with the Companies."[75] Plaintiffs seek dismissal of Cordell's counterclaim, stating the bona fide executive exemption bars any recovery under the Wage and Hour Act.[76]

38. N.C.G.S. § 95-25.14(b)(4) provides that the provisions of N.C.G.S. § 95-25.3 (Minimum Wage) and N.C.G.S. § 95-25.4 (Overtime) do not apply to "[a]ny person employed in a bona fide executive . . . capacity, as defined under the Fair Labor Standards Act." The Fair Labor Standards Act, in turn, defines "employee employed in a bona fide executive capacity" as "any employee who owns at least a bona fide 20-percent equity interest in the enterprise in which the employee is employed . . . and

---

[75] (Countercls. ¶ 252.)

[76] (Pls.' Br. Supp. 23.)

who is actively engaged in its management." 29B CFR § 541.101. "'[M]anagement' includes, but is not limited to, activities such as . . . planning the work; determining the techniques to be used . . . determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold[.]" 29B CFR § 541.102.

39.    Here, it is indisputable that Cordell owns a 25% equity interest in the Companies.[77]  Furthermore, it is indisputable that Cordell was "actively engaged in [the Companies'] management." 29B CFR § 541.101. Section 5.1 of the Operating Agreements provides "[t]he business and affairs of the Compan[ies] shall be managed by its . . . Managers . . . [and] the Managers shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Compan[ies], to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Compan[ies'] business."[78]  Section 5.2 of the Operating Agreements grants specific management authority to Cordell, stating:

> Andrew Cordell, as one of the four Managers, has the authority to act on behalf of the Compan[ies] in the execution of all documents necessary to sell, purchase or mortgage the property for or owned by the Compan[ies], and such signature from Andrew Cordell shall bind the Compan[ies] without the need for signature from any of the other Members or Managers.[79]

---

[77] Schedule A to the Operating Agreements provides that Cordell, Tudor, Harris, and Gelson each own a 25% equity interest in the Companies.  (Answer & Countercls., Exs. 1, 2.)

[78] (Answer & Countercls., Exs. 1, 2.)

[79] (Answer & Countercls., Exs. 1, 2.)

The pleadings before the Court demonstrate Cordell uncontrovertibly exercised his granted management authority, as evidenced by Cordell's signature, on behalf of Dapper, on the Real Estate Purchase Contract for a property located on Kensington Drive attached as Exhibit 3 to Cordell's Answer and Counterclaims.[80] Therefore, the Court **GRANTS** Plaintiffs' Motion as it relates to Cordell's third counterclaim for violation of the Wage and Hour Act and dismisses this counterclaim with prejudice.

### D. Cordell's Fourth Counterclaim and Plaintiffs' Second Claim for Declaratory Judgment – Occurrence of Triggering Event

40.     Plaintiffs next seek dismissal of Cordell's fourth counterclaim in which he "requests an Order from this Court declaring that a Triggering Event for purposes of Section 10.2(b) did not and could not occur, because Cordell was never an employee of the Companies."[81] Plaintiffs relatedly seek entry of judgment on the pleadings in Plaintiffs' favor that "[t]he Triggering Event under the Operating Agreements occurred on June 14, 2023."[82]

41.     Section 10.2(b) of the Operating Agreements provides:

A Member shall be terminated from the Company upon an affirmative vote in favor of such termination from the Members constituting a majority of the membership interest of the Company. Upon a Member's termination of employment with [Dapper/Tantalum] (other than retirement), or upon a Member's expiration of the term of employment ("Triggering Event"), the Member shall sell and the Company or the surviving Members shall purchase all of the Membership and Economic Interest of the Member. The procedures for purchase described in Section 10.2.a shall apply.  The purchase price shall be determined in

---

[80] (Answer & Countercls., Ex. 3, ECF No. 35.3; *see also* Countercls. ¶¶ 49–52.)

[81] (Countercls. ¶ 262.)

[82] (Mot. 3.)

accordance with Section 10.2.d below, and unless otherwise agreed among the parties the purchase price shall be due and payable in cash at closing.[83]

42. Article 4, Schedule A, and Section 5.2 of the Operating Agreements provide that Cordell, Tudor, Harris, and Gelson are the sole Members and Managers of the Companies and that Cordell, Tudor, Harris, and Gelson each have equal voting rights.[84] On 14 June 2023, Tudor, Harris, and Gelson, collectively constituting a majority of the Companies' membership interest, voted to terminate Cordell from the Company.[85] As stated previously, this Court holds that the doctrine of judicial estoppel bars Cordell from alleging he is not, and never was, an employee of the Companies.[86] Thus, the plain language of the Operating Agreements provides that the Individual Plaintiffs' 14 June 2023 vote had the impact of terminating both Cordell's status as a Member of the Companies and his employment with the Companies, constituting a Triggering Event.

43. Additionally, as Plaintiffs state in their supporting brief, "Cordell's current position is diametrically opposed to his admissions in the 2023 Litigation that a Triggering Event had occurred under the Operating Agreements."[87] In the Initial Lawsuit, Cordell asserted to this Court that a Triggering Event took place on 14 June

---

[83] (Compl., Exs. 1, 2; Answer & Countercls., Exs. 1, 2.)

[84] (Compl., Exs. 1, 2; Answer & Countercls., Exs. 1, 2.)

[85] (Compl., Ex. 4; Answer & Countercls., Ex. 7, ECF No. 35.7.)

[86] (*See supra* ¶¶ 21–31 and related notes.)

[87] (Pls.' Br. Supp. 12.)

2023, disputing only the effect of the Triggering Event.[88]  This Court accepted Cordell's assertions that a Triggering Event took place, necessarily relying on their truth in issuing the Consent Order and the 2 February 2024 and 23 February 2024 Orders enforcing the Consent Order.  The Individual Plaintiffs, like the Court, relied on Cordell's prior assertions regarding the occurrence of a Triggering Event.  They spent nearly two years and in excess of $100,000 defending the Initial Lawsuit, participating in buyout negotiations, engaging in an appraisal process predicated on the occurrence of a Triggering Event, and prosecuting the current lawsuit on the basis of Cordell's assertions in the Initial Lawsuit that he did not dispute whether a Triggering Event took place.[89]  To protect the integrity of the judicial process and to prevent the imposition of an unfair detriment on Plaintiffs, the Court, in its discretion, similarly holds the doctrine of judicial estoppel bars Cordell from alleging a Triggering Event did not, and could not, occur.

44.    For the reasons described above, the Court finds Plaintiffs are entitled to judgment as a matter of law on Cordell's fourth counterclaim.  The Court therefore **GRANTS** Plaintiffs' Motion to dismiss Cordell's fourth counterclaim for declaratory judgment and dismisses this counterclaim with prejudice.  Plaintiffs' Motion for Judgment on the Pleadings with respect to Plaintiffs' second claim requesting a declaratory judgment on the occurrence of a Triggering Event is similarly **GRANTED**.

---

[88] (*See, e.g.,* Initial Lawsuit Mem. Opp. Defs.' Mot. Dismiss 3–4.)

[89] (Pls.' Br. Supp. 12–13.)

E. **Cordell's Sixth Counterclaim and Plaintiffs' Second Claim for Declaratory Judgment – Status as Member**

45. In his sixth counterclaim, Cordell "requests an Order from this Court declaring that Cordell remains a Member of the Companies at this time."[90] Cordell contends that (1) "no Triggering Event for purposes of Section 10.2(b) of the Operating Agreements has occurred and his status as a Member of the Companies remains unaffected"[91] or, in the alternative, (2) "even if a 'Triggering Event' did occur, Cordell . . . remains a Member of the Companies until such time as the 'closing' contemplated by Section 10.2(d) occurs."[92]

46. Plaintiffs seek dismissal of Cordell's sixth counterclaim, contending "there is no real dispute that Cordell was removed as a member[.]"[93] Relatedly, Plaintiffs request entry of judgment on the pleadings in Plaintiffs' favor that, "[a]s of June 14, 2023, Cordell ceased to be a member . . . of each of the Companies[.]"[94]

47. The Court agrees with Plaintiffs. Section 10.2(b) of the Operating Agreements unambiguously states that "[a] Member shall be terminated from the Company upon an affirmative vote in favor of such termination from the Members constituting a majority of the membership interest of the Company."[95] On 14 June

---

[90] (Countercls. ¶ 285.)

[91] (Countercls. ¶ 280.)

[92] (Countercls. ¶ 281.)

[93] (Pls.' Br. Supp. 20.)

[94] (Mot. 3.)

[95] (Compl., Exs. 1, 2; Answer & Countercls., Exs. 1, 2.)

2023, Tudor, Harris, and Gelson, together constituting a majority of the membership interest of the Companies, affirmatively voted to terminate Cordell's membership interest.[96]  Although Section 57D-3-02 of the North Carolina Limited Liability Company Act, as Cordell states, provides that a "person ceases to be a member upon the occurrence of . . . [(3)] the transfer . . . of the person's entire economic interest," an operating agreement can "[s]upplant, vary, disclaim, or nullify the provisions of this Chapter or their application." N.C.G.S. § 57D-2-30.  Based on the plain language of the Operating Agreements and the Individual Plaintiffs' 14 June 2023 vote, the Court finds that Plaintiffs are entitled to judgment as a matter of law on Cordell's sixth counterclaim.  Thus, the Court **GRANTS** Plaintiffs' Motion to dismiss Cordell's sixth counterclaim for declaratory judgment and dismisses this counterclaim with prejudice.  Plaintiffs' Motion for Judgment on the Pleadings with respect to Plaintiffs' second claim requesting a declaratory judgment that Cordell ceased to be a member of each of the Companies on 14 June 2023 is similarly **GRANTED**.

F. **Cordell's Twelfth Counterclaim – Inspection of Books and Records**

48.  In his twelfth counterclaim, Cordell contends, "[a]s a Member of the Companies, Cordell is entitled to inspect the Companies' books and records under N.C.G.S. § 57D-3-04" and "requests that this Court order the Companies to permit inspection of the books and records . . . ; to pay the copying costs of such inspection; and to reimburse Cordell for his costs associated with bringing this action[.]"[97]

---

[96] (Compl., Ex. 4; Answer & Countercls., Ex. 7.)

[97] (Countercls. ¶¶ 327, 336.)

Plaintiffs seek dismissal of Cordell's counterclaim, contending Cordell's first demand for inspection was made after his status as a Member of the Companies was terminated on 14 June 2023.[98]

49. As both Plaintiffs and Cordell recognize, the information rights provided by N.C.G.S. § 57D-3-04 are limited to members of a limited liability company. For the reasons stated above, this Court holds the Individual Plaintiffs' 14 June 2023 vote terminated Cordell's status as a Member of the Companies.[99] As Cordell did not make his first demand for inspection until 16 June 2023, two days after his status as a Member was terminated, the Court finds that no material issue of fact exists, and Plaintiffs are entitled to judgment as a matter of law on Cordell's twelfth counterclaim. Plaintiffs' Motion to dismiss Cordell's twelfth counterclaim is **GRANTED** and this counterclaim is dismissed with prejudice.

## G. Cordell's Fifteenth Counterclaim – Judicial Dissolution Pursuant to N.C.G.S. § 57D-6-02

50. In his fifteenth counterclaim, Cordell contends "[t]he liquidation of the Companies is necessary to protect [his] rights and interests[.]"[100] Specifically, Cordell alleges, "Individual Plaintiffs have taken actions to operate the Companies to the exclusion of Cordell, despite his [reasonable and] clearly expressed expectations" and "Plaintiffs have operated the Companies in a manner that is inconsistent with applicable law," as demonstrated by the nuisance violation letters and permit

---

[98] (Pls.' Br. Supp. 21.)

[99] (*See supra* ¶¶ 45–47 and related notes.)

[100] (Countercls. ¶ 356.)

violation letter received from the City of Charlotte and the demand for unpaid homeowners association fees received from the Wildwood Meadows Homeowners Association.[101]   Plaintiffs seek dismissal of Cordell's claim for judicial dissolution, stating the claim is moot because only members of a limited liability company have standing to request judicial dissolution.[102]

51.   As Plaintiffs allude, under N.C.G.S. § 57D-6-02:

> The superior court may dissolve an LLC in a proceeding brought by either of the following: (1) The Attorney General . . . (2) A member, if it is established that (i) it is not practicable to conduct the LLC's business in conformance with the operating agreement and this Chapter or (ii) liquidation of the LLC is necessary to protect the rights and interests of the member.

Since this Court has determined that Cordell is no longer a Member of the Companies,[103] Cordell lacks standing to request judicial dissolution and this Court lacks jurisdiction to grant judicial dissolution.   Therefore, the Court **GRANTS** Plaintiffs' Motion to dismiss Cordell's fifteenth counterclaim and dismisses this counterclaim with prejudice.

## H. Cordell's Seventh Counterclaim and Plaintiffs' Second Claim for Declaratory Judgment – Status as Manager

52.   Plaintiffs next seek dismissal of Cordell's seventh counterclaim for "an Order from this Court declaring that Cordell's status as a Manager of the Companies

---

[101] (Countercls. ¶¶ 358, 362.)

[102] (Pls.' Br. Supp. 21.)

[103] (*See supra* ¶¶ 45–47 and related notes.)

was not terminated by the June 14, 2023 vote of the Individual Plaintiffs."[104] Plaintiffs similarly request entry of judgment on the pleadings in Plaintiffs' favor that, "[a]s of June 14, 2023, Cordell ceased to be a . . . manager of each of the Companies[.]"[105]

53. Cordell contends, because he remains a Member for the reasons listed in his sixth counterclaim, he also remains a Manager of the Companies because Section 5.2 of the Operating Agreements provides that "[e]ach Member, by virtue of his or her status as a Member, shall be a Manager of the Company[.]"[106]  Plaintiffs, however, contend "[t]he June 14, 2023 Notice removed Cordell as a Manager of both Companies as a matter of law" pursuant to Section 5.2 of the Operating Agreements.[107]

54. Section 5.2 of the Operating Agreements provides that "remov[al] [of] a Manager shall require the affirmative vote of Members owning at least a majority of all interests in the Company."[108]  On 14 June 2023, Tudor, Harris, and Gelson, together constituting a majority of the membership interest of the Companies, affirmatively voted to terminate Cordell as a Manager of the Companies.[109]  As the 14 June 2023 vote additionally terminated Cordell's status as a Member of the

---

[104] (Countercls. ¶ 292.)

[105] (Mot. 3.)

[106] (Def.'s Resp. 20.)

[107] (Pls.' Br. Supp. 19–20.)

[108] (Compl., Exs. 1, 2; Answer & Countercls., Exs. 1, 2.)

[109] (Compl., Ex. 4; Answer & Countercls., Ex. 7.)

Companies, for the reasons described above,[110] this Court finds Cordell's argument to be moot. The Court therefore **GRANTS** Plaintiffs' Motion to dismiss Cordell's seventh counterclaim for declaratory judgment and dismisses this counterclaim with prejudice. The Court further **GRANTS** Plaintiffs' Motion with respect to Plaintiffs' second claim requesting a declaratory judgment that Cordell ceased to be a manager of each of the Companies on 14 June 2023.

## I. Cordell's Fifth Counterclaim and Plaintiffs' Second Claim for Declaratory Judgment – Valuation Dates

55. In his fifth counterclaim, Cordell alleges the Operating Agreements do not specify the effective date for the valuation of the Companies' assets or for the determination of the Companies' liabilities.[111] He "requests an Order from this Court declaring that the appropriate valuation date for both the assets and liabilities of the Companies is December 12, 2023[,]" the date on which the first appraisal was transmitted to Cordell.[112] Plaintiffs seek dismissal of Cordell's counterclaim, contending that 14 June 2023, the date on which the Individual Plaintiffs voted to terminate Cordell as an employee, member and manager of the Companies, is the appropriate valuation date.[113] Plaintiffs similarly seek entry of judgment on the pleadings in Plaintiffs' favor that "[t]he Triggering Event is the effective date for

---

[110] (*See supra* ¶¶ 45–47 and related notes.)

[111] (Countercls. ¶¶ 267–68.)

[112] (Countercls. ¶¶ 269, 271.)

[113] (Pls.' Br. Supp. 17–18.)

purposes of the appraisals of the Companies' assets under Section 10.2.d of the Operating Agreements."[114]

56. The Declaratory Judgment Act, N.C.G.S. § 1-253 *et seq.*, as described earlier, authorizes a court to declare the "rights, status, and other legal relations" of adverse parties when an actual dispute exists. *PHE, Inc. v. Dolinsky*, 2022 NCBC LEXIS 123, at **19 (N.C. Super. Ct. Oct. 19, 2022). If a genuine controversy is adequately pled, the claim for a declaratory judgment may move forward. Indeed, "[t]he question is not whether the plaintiff[s] will prevail on their claim, it is only whether they have identified an actual, genuine controversy." *BIOMILQ, Inc. v. Guiliano*, 2023 NCBC LEXIS 24, at **32 (N.C. Super. Ct. Feb. 10, 2023) (cleaned up). *Morris v. Plyler Paper Stock Co.*, 89 N.C. App. 555, 557 (1988) ("A motion to dismiss for failure to state a claim is seldom appropriate 'in actions for declaratory judgments, and will not be allowed simply because the plaintiff may not be able to prevail.'").

57. Here, Cordell has identified an actual, genuine controversy regarding the valuation date. Section 10.2(b) of the Operating Agreements provides in relevant part:

> Upon a Member's termination of employment with [the Companies] . . . ("Triggering Event"), the Member shall sell and the Compan[ies] or the surviving Members shall purchase all of the Membership and Economic Interest of the Member. The procedures for purchase described in Section 10.2.a shall apply. The purchase price shall be determined in accordance with Section 10.2.d below, and unless otherwise agreed

---

[114] (Mot. 3.)

among the parties the purchase price shall be due and payable in cash at closing.[115]

Section 10.2(a), in turn, outlines the procedure to be utilized following a "Triggering Event" under Section 10.2(b):

> The closing of the purchase and sale shall take place within six (6) months of the date of [the "Triggering Event"]. The purchase price for the Membership and Economic Interest of the [terminated] Member shall be determined in accordance with the provisions of Section 10.2.d below. Unless otherwise agreed among the parties, the purchase price shall be due and payable in cash at closing.[116]

Section 10.2(d) of the Operating Agreements prescribes the below valuation process for determining the purchase price of a Membership Interest:

> [T]o determine the purchase price for a Membership or Economic Interest in the Company, all of the assets of the Company shall be valued at their fair market value and any liabilities or debts of the Company shall be subtracted from the total value to determine the fair market value of the Company. The resulting amount shall then be multiplied times the percentage Membership or Economic Interest in the Company to be purchased to determine the purchase price for the Membership or Economic Interest in the Company. The fair market value of the assets of the Company shall be determined by agreement of the parties or, in the absence of agreement, by a duly qualified appraiser. If the parties cannot agree upon the fair market value of the assets of the Company, the Company shall hire and pay for a qualified appraiser to determine the fair market value of the assets. In the event the selling Member objects to or disagrees with the value determined by the appraiser hired by the Company, the selling Member shall have the right, at his or her expense, to hire a second appraiser to determine the fair market value of the assets of the Company. In the event the Company objects to the value determined by the appraiser by the selling Member, the two appraisers shall then select a third appraiser to determine the fair market value of the assets of the Company. The cost of the third appraisal shall be shared equally by the Company and the selling Member. The fair market value of the assets of the Company determined by the third appraiser shall be binding upon all parties. In

---

[115] (Compl., Exs. 1, 2; Answer & Countercls., Exs. 1, 2.)

[116] (Compl., Exs. 1, 2; Answer & Countercls., Exs. 1, 2.)

the determination of the fair market value of the assets of the Company, the appraiser shall take into account all assets of the Company excluding any "goodwill" and any life insurance proceeds in excess of cash value paid to or for the benefit of the Company as a result of a Member's death. For purposes of this subparagraph, in the event the Company owns any real estate, a qualified appraiser shall be deemed to be an appraiser having an MAI designation, unless otherwise mutually agreed by the parties.[117]

58.     At no point do the Operating Agreements specify the effective date for the valuation of the Companies' assets or determination of the Companies' liabilities. The Consent Order agreed to by the parties and attached to the pleadings similarly does not clearly identify a valuation date.[118] Because Cordell has adequately pled the existence of a genuine controversy regarding the valuation date, Plaintiffs' Motion for Judgment on the Pleadings with respect to Cordell's fifth counterclaim and Plaintiffs' second claim requesting a declaratory judgment on the valuation date shall be **DENIED**.

59.     Plaintiffs relatedly request that the Court grant their Motion for Judgment on the Pleadings with respect to Plaintiffs' second claim for declaratory judgment that "(iv) The figure to be used for purposes of the appraisal of the assets of the Companies are those set forth in Exhibit 14 to the Plaintiffs' Complaint as of June 14, 2023; [and] (v) The figure to be used for purposes of deducting the liabilities of the Companies from the appraised value[] of the assets is to be the liabilities as calculated by the Companies' accountants on financial statements kept in the regular course of

---

[117] (Compl., Exs. 1, 2; Answer & Countercls., Exs. 1, 2.)

[118] (Initial Lawsuit Consent Scheduling Order.)

business."[119]   The Court declines to address whether Plaintiffs are entitled to judgment on the pleadings with respect to these aspects of Plaintiffs' second claim because Plaintiffs did not address these arguments in their brief.  *See* N.C. Bus. Ct. Rule 7.2 ("A party should . . . brief each issue and argument that the party desires the Court to rule upon and that the party intends to raise at a hearing.").   Thus, Plaintiffs' Motion as it pertains to these aspects of Plaintiffs' second claim for declaratory judgment shall be **DENIED.**

## J.  Cordell's Eleventh Counterclaim – Breach of Fiduciary Duty

60.    Plaintiffs next seek entry of judgment on the pleadings on Cordell's eleventh counterclaim for breach of fiduciary duty.   Cordell contends "[t]he Individual Plaintiffs owed fiduciary duties in their capacities as Managers of the Companies to Cordell in his capacity as a Member of the Companies."[120]  The Individual Plaintiffs breached their fiduciary duties, Cordell argues, "by, among other things, causing the Companies to refuse to provide complete and accurate financial information to Cordell and/or misrepresenting the financial status of the Companies to Cordell."[121] Plaintiffs, however, maintain judgment on the pleadings is appropriate here because "managers of a limited liability company . . . owe a fiduciary duty to the company, and not to individual members."[122]

---

[119] (Mot. 3.)

[120] (Countercls. ¶ 320.)

[121] (Countercls. ¶ 321.)

[122] (Pls.' Br. Supp. 25 (quoting *Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469, 474 (2009)).)

61. To state a claim for breach of fiduciary duty, a counterclaim plaintiff must plead the existence of a fiduciary duty, a breach of that duty, and injury proximately caused by the breach. *See e.g., Green v. Freeman*, 367 N.C. 136, 141 (2013). Where there is no fiduciary duty, there can be no claim for its breach. *Governor's Club Inc. v. Governors Club Ltd. P'ship*, 152 N.C. App. 240, 247 (2002).

62. A fiduciary relationship is one in which "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *CommScope Credit Union v. Butler & Burke, LLP*, 369 N.C. 48, 52 (2016). "[I]t extends to any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side, and *resulting domination and influence on the other*." *Dalton v. Camp*, 353 N.C. 647, 651–52 (quoting *Abbitt v. Gregory*, 201 N.C. 577, 598 (1931)) (emphasis in original). "North Carolina recognizes two types of fiduciary relationships: *de jure*, or those imposed by operation of law, and *de facto*, or those arising from the particular facts and circumstances constituting and surrounding the relationship." *Hager v. Smithfield E. Health Holdings, LLC*, 264 N.C. App. 350, 355 (2019) (citing *Lockerman v. S. River Elec. Mbrshp. Corp.*, 250 N.C. App. 631, 635 (2016)).

63. Here, as both parties recognize, no *de jure* fiduciary relationship is present as "the default rule is that managers of a limited liability company owe duties to the company and not its members."[123] *See, e.g., Mary Annette, LLC v. Crider*, 2023 NCBC

---

[123] (Def.'s Resp. 27.)

LEXIS 28, at **10–11 (N.C. Super. Ct. Feb. 23, 2023) ("Generally, members of an LLC don't owe fiduciary duties to each other or the company, and managers and officers owe fiduciary duties to the company but not to the members." (citing *Kaplan v. O.K. Techs., L.L.C*, 196 N.C. App. 469, 473–74 (2009))). Thus, for Cordell's counterclaim to survive a Rule 12(c) motion, he must adequately plead the existence of a *de facto* fiduciary relationship.

64. "The standard for finding a *de facto* fiduciary relationship is a demanding one: Only when one party figuratively holds all the cards—all the financial power or technical information, for example—have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen." *Lockerman*, 250 N.C. App. at 636 (citation and internal quotation marks omitted). It is insufficient to allege mere influence over another's affairs. *Hartsell v. Mindpath Care Ctrs.*, 2022 NCBC LEXIS 130, at **11 (N.C. Super. Ct. Nov. 2, 2022).

65. Thus, the question here is whether Cordell has sufficiently pled that the Individual Plaintiffs "held all the cards." In his counterclaim, Cordell alleges that, "[s]tarting on June 6, 2023, and before any steps were taken by Individual Plaintiffs to attempt to remove Cordell as a Member, Manager, or purported employee of the Companies, Individual Plaintiffs took affirmative steps to limit Cordell's visibility into the finances of each of the Companies."[124] Specifically, Cordell alleges, the

[124] (Countercls. ¶ 85.)

Individual Plaintiffs removed his access to all of the Companies' bank accounts and changed lockbox codes on several Dapper properties.[125]

66. However, Cordell subsequently alleges "[a]fter learning of the Individual Plaintiffs' actions, Cordell contacted the [bank's] branch manager, who advised Cordell that Bank OZK had inadvertently failed to adhere to their internal verification process . . . [and] restored his account access on June 7, 2023."[126] Similarly, when the Individual Plaintiffs allegedly "once again[] attempted to remove Cordell from the Companies' Bank OZK accounts" on 29 June 2023, Cordell was able to contact the Bank OZK branch manager, resulting in a hold being placed on the Companies' bank accounts until the pending litigation could be resolved.[127] Furthermore, Cordell states the parties "engage[d] in substantive negotiations . . . which resulted in numerous offers and counteroffers being exchanged between Cordell and the Individual Plaintiffs" related to a voluntary buyout of Cordell's membership interest.[128] Assuming the truth of these allegations, as is required at the Rule 12(c) stage, it is clear that the Individual Plaintiffs did not exercise near-complete domination over Cordell and that, at the very least, Cordell was still holding "a card or two" during the relevant period. *See Bourgeois v. Lapelusa*, 2022 NCBC LEXIS 111, at **15 (N.C. Super. Ct. Sept. 23, 2022).

---

[125] (Countercls. ¶¶ 86–87, 89.)

[126] (Countercls. ¶ 87.)

[127] (Countercls. ¶¶ 106–113.)

[128] (Countercls. ¶ 68.)

67. Without the existence of a *de jure* or *de facto* fiduciary relationship there can be no claim for breach of fiduciary duty. Therefore, the Court **GRANTS** Plaintiffs' Motion for Judgment on the Pleadings with respect to Cordell's eleventh counterclaim and this counterclaim is dismissed with prejudice.

## K. Cordell's Ninth Counterclaim – Breach of Contract – Operating Agreements

68. In his ninth counterclaim, Cordell alleges the Individual Plaintiffs breached the Operating Agreements by: (1) "failing to maintain accurate Capital Accounts as required by [Section 8.3 of] the Operating Agreements"; (2) failing to make distributions in accordance with Section 9.2 of the Operating Agreements; (3) failing to maintain accurate accounting records on a cash basis and in accordance with accepted accounting principles as required by Section 9.3 of the Operating Agreements; and (4) "refusing to reimburse Cordell [the amount of] $24,154.95 following the submission of [documents justifying] such reimbursements to the Companies [in breach of Section 5.9]."[129] Plaintiffs seek entry of judgment on the pleadings in their favor, contending "[t]his cause of action references various concepts from the Operating Agreements – such as maintenance of capital accounts, distributions, accounting principles and reimbursements of expenses upon receipt of appropriate documentation – without describing the date or substance of any purported breach."[130]

---

[129] (Countercls. ¶¶ 6(i), 303–12.)

[130] (Pls.' Br. Supp. 24.)

69. "Unlike claims subject to Rule 9, a claim for breach of contract is not subject to heightened pleading standards[.]" *AYM Techs., LLC. v. Rodgers*, 2018 NCBC LEXIS 14, at *52–53 (N.C. Super. Ct. Feb. 9, 2018). To properly plead a breach of contract claim, a plaintiff need only allege "(1) [the] existence of a valid contract and (2) [a] breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26 (2000).

70. In considering a 12(c) motion, the trial court is required to view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the non-moving party. *See, e.g., Anderson Creek Partners, L.P.*, 382 N.C. at 11–12. Here, viewing the facts and allegations in the light most favorable to Cordell, the Court cannot conclude that Plaintiffs are entitled to judgment as a matter of law as to Cordell's breach of contract claim. Cordell has properly alleged the existence of a contract, a breach of the contract, and damages proximately resulting therefrom.[131] Accordingly, Cordell's pleadings are sufficient to survive a Rule 12(c) motion and the Court **DENIES** Plaintiffs' Motion with respect to Cordell's ninth counterclaim.

## L. **Cordell's Tenth Counterclaim – Breach of the Implied Covenant of Good Faith and Fair Dealing – Operating Agreements**

71. Plaintiffs next seek dismissal of Cordell's tenth counterclaim for breach of the implied covenant of good faith and fair dealing.

72. In addition to its express terms, "[i]n every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Governor's*

---

[131] (Countercls. ¶¶ 302–313.)

*Club Inc.*, 152 N.C. App. at 251 (citation omitted) (internal quotation marks omitted). To state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must "plead that the party charged took action 'which injure[d] the right of the other to receive the benefits of the agreement,' thus 'depriv[ing] the other of the fruits of [the] bargain.'" *Conleys Creek Ltd. P'ship v. Smoky Mt. Country Club Prop. Owners Ass'n,* 255 N.C. App. 236, 253 (2017) (quoting *Bicycle Transit Auth. v. Bell*, 314 N.C. 219, 228–29 (1985)). "Evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance" may each constitute a breach of the implied covenant of good faith and fair dealing. *Intersal, Inc. v. Wilson*, 2023 NCBC LEXIS 29, at **67 (N.C. Super. Ct. Feb. 23, 2023) (quoting *Restatement 2d of Contracts* § 205 cmt. d (1981)).

73. Cordell's implied covenant claim rests on many of the same grievances as his breach of contract claim; specifically, that Plaintiffs breached the implied covenant by: (1) "restrict[ing], limit[ing] and otherwise obstruct[ing] Cordell's access to the Companies' email account, bank accounts, financial records, and properties"; and (2) "knowingly and intentionally manipulat[ing] or otherwise alter[ing] their financial records in a manner designed to mislead Cordell into believing that his Membership Interest was less valuable than the true and accurate records would have reflected."[132]

---

[132] (Countercls. ¶ 317.)

74. Under North Carolina law, "where a party's claim for breach of the implied covenant of good faith and fair dealing is based upon the same acts as its claim for breach of contract, we treat the former claim as 'part and parcel' of the latter." *Cordaro v. Harrington Bank, FSB*, 260 N.C. App. 26, 38–39 (2018); *see also Se. Anesthesiology Consultants, PLLC v. Rose*, 2019 NCBC LEXIS 52, at *23 (N.C. Super. Ct. Aug. 20, 2019) ("[G]ood faith and fair dealing claims that are 'part and parcel' of breach of contract claims . . . merely stand or fall together."). Accordingly, the Court **DENIES** Plaintiff's Motion on Cordell's counterclaim for breach of the implied covenant of good faith and fair dealing in the same manner as the Court has denied Plaintiffs' Motion on Cordell's breach of contract counterclaim.

## M. **Plaintiffs' First Claim for Breach of Contract**

75. Plaintiffs' first claim for breach of contract is premised on Cordell's alleged breach of the Operating Agreements by (i) refusing to accept a buyout offer in June 2023 in breach of Section 10, and (ii) unilaterally causing Bank OZK (the "Bank") to freeze the Companies' funds in late June or early July 2023 in breach of Article 5.3.[133]

76. Plaintiffs contend they are entitled to judgment on the pleadings in their favor regarding the first aspect of this claim because "Cordell has unequivocally admitted that he was an employee of the Companies and that a 'Triggering Event' under Section 10.2.d occurred such that the Companies are required to redeem his interests."[134] Cordell maintains, however, that "[t]he terms of the Operating

---

[133] (Compl. ¶¶ 89–91, 152–58.)

[134] (Pls.' Br. Supp. 9–10.)

Agreements demonstrate the lack of a Triggering Event"[135] and Plaintiffs, by not producing the first appraisal report until 12 December 2023, failed to abide by the multi-step buyout process outlined in Section 10.2(d) of the Operating Agreements.[136]

77.    As an initial matter, for reasons stated in Section D of this Opinion, this Court holds a Triggering Event under Section 10 of the Operating Agreements occurred on 14 June 2023. However, the plain language of the Operating Agreements does not require Cordell to accept a buyout offer upon the occurrence of a Triggering Event. Section 10.2(d) of the Operating Agreements provides:

> If the parties cannot agree upon the fair market value of the assets of the Company, the Company shall hire and pay for a qualified appraiser to determine the fair market value of the assets. In the event the selling Member objects to or disagrees with the value determined by the appraiser hired by the Company, the selling Member shall have the right, at his or her expense, to hire a second appraiser to determine the fair market value of the assets of the Company. In the event the Company objects to the value determined by the appraiser by the selling Member, the two appraisers shall then select a third appraiser to determine the fair market value of the assets of the Company. . . . The fair market value of the assets of the Company determined by the third appraiser shall be binding upon all parties.[137]

Section 10.2(a) of the Operating Agreements sets a deadline for the buyout of a terminated Member's interests, providing "[t]he closing of the purchase and sale [of the membership interests] shall take place within six (6) months of the [Triggering Event]."[138]

---

[135] (Def.'s Resp. 14; *see also* Countercls. ¶¶ 6, 146–47, 262.)

[136] (Countercls. ¶¶ 133–37.)

[137] (Compl., Exs. 1, 2; Answer & Countercls., Exs. 1, 2.)

[138] (Compl., Exs. 1, 2; Answer & Countercls., Exs. 1, 2.)

78. Here, Cordell states Plaintiffs provided the first appraisal report on 12 December 2023, two days before the closing deadline of 14 December 2023.[139] By providing the first appraisal report only two days before closing, Cordell alleges, "Plaintiffs knew that Cordell would be unable to realize the benefits and protections afforded by Section 10.2(d)[.]"[140] Viewing the facts and permissible inferences in the light most favorable to Cordell, the Court cannot conclude that no material issue of fact exists and that Cordell breached the Operating agreements by refusing to accept a buyout offer. Thus, the Court **DENIES** Plaintiff's Motion for Judgment on the Pleadings with respect to Plaintiffs' first claim for breach of contract.

79. The Court declines to address whether Plaintiffs are entitled to judgment on the pleadings in respect to the second aspect of this claim because Plaintiffs did not address this argument in their brief. *See* N.C. Bus. Ct. Rule 7.2. Accordingly, the Court **DENIES** Plaintiffs' Motion as it relates to the second aspect of Plaintiffs' claim for breach of contract to the extent Plaintiffs' counsel argued it at the Hearing.

### N. Plaintiffs' Fourth Claim for Breach of Contract – the Consent Order

80. Plaintiffs next seek entry of judgment on the pleadings in their favor on Plaintiffs' fourth claim for breach of contract. In their Complaint, Plaintiffs allege Cordell breached the 13 December 2023 Consent Order by "failing to accept the Companies' tender on the agreed-upon timeframe."[141]

---

[139] (Countercls. ¶¶ 133–34.)

[140] (Countercls. ¶ 136.)

[141] (Compl. ¶ 180.)

81. Though Plaintiffs move for judgment on the pleadings on their fourth claim, they do not address this issue in their brief. Therefore, the Court declines to consider whether Plaintiffs are entitled to judgment on the pleadings for their fourth claim and **DENIES** Plaintiff's Motion with respect to this claim to the extent Plaintiffs' counsel argued the claim at the Hearing. *See* Bus. Ct. Rule 7.2.

**O. Cordell's Eighth Counterclaim and Plaintiffs' Second Claim for Declaratory Judgment – Winston Property**

82. Plaintiffs next seek dismissal of Cordell's eighth counterclaim for "an Order from this Court declaring that any payment to Cordell in exchange for his Membership Interest as part of a voluntary sale of his Membership Interest is not subject to a setoff."[142] In relevant part, the Interest and Property Transfer Agreement, which provides for the transfer of the Winston Property to Cordell's company, Creta Construction LLC, provides the following:

> 2. Credit. . . . The Parties hereby agree that, upon the transfer of the [Winston] Property to Creta pursuant to the Deed, the aggregate purchase price required to be paid to Cordell in connection with the buyout of Cordell's membership interests in the Companies in accordance with the terms of the operating agreement of the Companies, or as a result of the [Initial Lawsuit], shall be reduced by an amount equal to $181,807.51 (the "Credit").[143]

Cordell contends the Interest and Property Transfer Agreement does not give Plaintiffs the right to offset against any future purchase of Cordell's Membership Interest because, among other reasons: (1) "[t]he obligations under Section 10.2 of the

---

[142] (Countercls. ¶ 299.)

[143] (Answer & Countercls., Ex. 29, ECF No. 35.29.)

Operating Agreements were not triggered"; (2) "[t]he Initial Lawsuit has been dismissed pursuant to Rule 41(a)"; and (3) "[t]he funds were deemed by Plaintiffs to be an in-kind distribution made on November 1, 2023."[144] Plaintiffs, however, maintain the "Interest and Property Transfer Agreement entitles Dapper to an offset against the purchase price of Cordell's interest in the amount of $181,807.51."[145]

83. Here, Cordell fails to adequately plead the existence of a genuine controversy. In the Consent Order, which this Court has previously found to be a "valid and enforceable contract between the parties under North Carolina law,"[146] the parties "agree and acknowledge that, pursuant to the Interest and Property Transfer Agreement, . . . the price required to be paid to Cordell by the Companies for the purchase and sale of the Interest pursuant to Article 10 of the Operating Agreements shall be reduced by an amount equal to $181,807.51."[147] Likewise, in the Statement of Purpose section of the Interest and Property Transfer Agreement, the parties clearly state their intent for the transfer of the Winston Property to serve as a credit to be applied to the buyout of Cordell's membership interests in the Companies: "Whereas, the Seller Parties[, the Plaintiffs,] desire to transfer, and the Buyer Parties[, Cordell,] desire that Creta acquire, the [Winston] Property *in exchange for*

---

[144] (Countercls. ¶ 298.)

[145] (Mot. 3.)

[146] (Order & Op. on Def.'s Mot. Dismiss Pursuant R. 12(b)(6) ¶ 52; *see also Dapper Dev., L.L.C.*, 2024 NCBC LEXIS 126, at **25.)

[147] (Initial Lawsuit Consent Scheduling Order 6.)

*a credit of $181,807.51 to be applied to the buyout of Cordell's membership interests in the [Companies]*, as described below.[148]

84. Furthermore, for reasons described previously, this Court holds the obligations under Section 10.2 of the Operating Agreements have been triggered, requiring Cordell to sell, and the Plaintiffs to purchase, his membership and economic interests in the Companies.[149] The plain language of paragraph 2 of the Interest and Property Transfer Agreement, quoted above, additionally provides the settlement or final determination of the Initial Lawsuit is not a precondition to the existence of the credit. Therefore, the Court **GRANTS** Plaintiffs' Motion to the extent it pertains to Cordell's eighth counterclaim for declaratory judgment and dismisses this counterclaim with prejudice. The Court similarly **GRANTS** Plaintiffs' Motion for Judgment on the Pleadings with respect to Plaintiffs' second claim requesting a declaratory judgment that the Interest and Property Transfer Agreement entitles Dapper to an offset of $181,807.51 against the purchase price of Cordell's interest in the company.

## P. Cordell's Thirteenth Counterclaim – Equitable Accounting

85. As "Cordell's information rights have proven to be inadequate in his pursuit to determine the accurate calculation of the Companies' liabilities and his capital account balance[,]" Cordell requests that the "Court order the Companies to hire a neutral third-party accounting professional to conduct an audit of the Companies'

---

[148] (Answer & Countercls., Ex. 29 (emphasis added).)

[149] (*See supra* ¶¶ 40–44.)

books and records[.]"[150]   Plaintiffs seek dismissal of this counterclaim as only members of a limited liability company can seek equitable accounting.[151]

86.   This Court has held that equitable accounting "is a remedy, not an independent cause of action, and is available only if the plaintiff first shows that he lacks an adequate remedy at law and alleges facts in the complaint to that effect." *Elhulu v. Alshalabi*, 2021 NCBC LEXIS 44, at \*\*20 (N.C. Super. Ct. Apr. 29, 2021) (cleaned up).   The Court concludes that Defendant is not entitled to an equitable accounting under the pleadings at issue.   Therefore, Plaintiffs' Motion is **GRANTED** as to Cordell's "claim" for an equitable accounting.   Cordell's thirteenth counterclaim, however, is dismissed without prejudice to Cordell's ability to seek an equitable accounting as a remedy at a later stage of this litigation to the extent permitted by applicable law.   While the Court may ultimately conclude that Cordell is not entitled to an accounting, the Court cannot conclude, at the motion for judgment on the pleadings stage, that Cordell cannot plausibly allege a proper claim for an accounting.

### Q.  Cordell's Fourteenth Counterclaim – Reimbursement/Contribution

87.   Lastly, Plaintiffs seek entry of judgment on the pleadings in Plaintiffs' favor on Cordell's counterclaim for reimbursement/contribution.   In his counterclaim, Cordell alleges, "[a]fter the Individual Plaintiffs transmitted the Termination Notice, Cordell became aware that the Companies were in default or had failed to satisfy several [of] the Companies' debts and/or financial obligations, which were due and

---

[150] (Countercls. ¶¶ 341, 343.)

[151] (Pls.' Br. Supp. 21.)

owing."[152]  "Upon receiving notice of the Companies' outstanding debts and/or financial obligations," Cordell states, he "took steps to satisfy them" even though the Companies were the primary obligors on the debt obligations and Cordell and the Individual Plaintiffs were secondary obligors.[153]  Despite Cordell's satisfaction of the Companies outstanding financial obligations, he alleges, the Plaintiffs have repeatedly refused to reimburse him for the expenses incurred to satisfy the Companies' debts.[154]  Plaintiffs contend Cordell's counterclaim should be dismissed because (1) "'reimbursement' is not a cause of action under North Carolina law"; (2) "'contribution' applies only in the context of joint tortfeasors and is inapplicable here"; (3) Cordell does not "identify anywhere in his pleading what specifically he alleges entitles him to 'reimbursement/contribution'"; and (4) the counterclaim "is premised on purported payments he made on behalf of the Companies AFTER his termination[.]"[155]

88.    Despite Plaintiffs' contentions, reimbursement is a cause of action under North Carolina law.  N.C.G.S. § 26-3.1 provides where a guarantor pays the debt of his principal, the guarantor has a right to "either sue his principal for reimbursement or sue his principal on the instrument and may maintain any action or avail himself of any remedy which the creditor himself might have had against the principal

---

[152] (Countercls. ¶ 347.)

[153] (Countercls. ¶¶ 348–50.)

[154] (Countercls. ¶¶ 351–54.)

[155] (Pls.' Br. Supp. 25–26.)

debtor." Here, Cordell alleged that: (1) the "Companies have a number of secured and unsecured debt obligations from various creditors"; (2) the "Companies are the primary obligors on the debt obligations"; (3) "Cordell . . . [was a] secondary obligor[] on one or more of the Companies' outstanding debts and/or financial obligations"; and (4) "[u]pon receiving notice of the Companies' outstanding debts and/or financial obligations, Cordell took steps to satisfy them."[156] Viewing the facts and allegations in the light most favorable to Cordell, the Court cannot conclude at this point that Plaintiffs are entitled to judgment as a matter of law as to Cordell's reimbursement/contribution claim. Cordell has adequately alleged the existence of a debt owed by the Companies, that he was a guarantor of the principal's debt, and that he paid the debt of his principal. Accordingly, Cordell's pleadings are sufficient to survive a Rule 12(c) motion and the Court **DENIES** Plaintiffs' Motion with respect to Cordell's fourteenth counterclaim.

IV.

CONCLUSION

89. **WHEREFORE**, for the reasons set forth above, the Court hereby **GRANTS in part** and **DENIES in part** the Motion as follows:

a. Plaintiffs' Motion is **GRANTED** with respect to Defendant's first, second, third, fourth, sixth, seventh, eighth, eleventh, twelfth, and fifteenth counterclaims, and these claims are hereby **DISMISSED with prejudice**.

---

[156] (Countercls. ¶¶ 346, 348–50.)

b. Plaintiffs' Motion is **GRANTED** as to subsections (i) (Triggering Event), (iii) (Cordell's status as a Member or Manager), and (vi) (setoff) of Plaintiffs' second claim for relief, and these claims are hereby **DISMISSED with prejudice**.

c. Plaintiffs' Motion is **GRANTED** with respect to Defendant's thirteenth counterclaim, and this claim is hereby **DISMISSED without prejudice**.

d. Plaintiffs' Motion is **DENIED** as to Plaintiffs' first and fourth claims for relief.

e. Plaintiffs' Motion is **DENIED** as to subsections (ii) (effective date for purposes of appraisals), (iv) (figure to be used for purposes of the appraisal), and (v) (figure to be used for purposes of deducting liabilities) of Plaintiffs' second claim for relief.

f. Plaintiffs' Motion is **DENIED** with respect to Defendant's fifth, ninth, tenth, and fourteenth counterclaims.

g. Plaintiffs' Motion is otherwise **DENIED**.

**SO ORDERED**, this the 15th day of July, 2025.

/s/ A. Todd Brown
A. Todd Brown
Special Superior Court Judge
 for Complex Business Cases